[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This case is a war of wills cloaked in a custody dispute. The battle consumed eleven trial days, and the parties have incurred approximately three hundred and seventeen ($317,000) thousand dollars on legal fees and attendant litigation costs.[1] They each seek residential custody of their fourteen year old son, Gregory. Additionally, they are in dispute regarding support, alimony, and the appropriate allocation of assets. During the course of the litigation, the court appointed Attorney Frank Santy as counsel for the minor child, and the court ordered an independent custody evaluation by James C. Black, M.D.[2] Also, the parties and Gregory underwent psychological evaluations, and Mr. Bauer was seen by a neurologist and a substance abuse evaluator. Each of medical and mental health professionals provided a report to the court. Several of them testified as well. Based on the evidence adduced at trial, the court makes the following findings and orders.
THE MARRIAGE
Charles and Patricia Bauer were married on May 15, 1982 in Dearborn, Michigan. They have one child, Gregory, who was born on August 18, 1983. The parties met in 1970 while employed by the same company in Michigan. In 1974, they began living together in Levonia, Michigan until Mrs. Bauer accepted employment in Washington, D.C. The parties next lived together in Connecticut beginning in 1980 when they purchased a home at 177 High Ridge Road in Avon. In 1981, in conjunction with Mr. Bauer's commencement of employment with New York Life in New York City, he moved to New Jersey where he purchased a condominium. Though the parties were subsequently married in 1982, they continued to live apart, visiting on weekends, until Mr. Bauer left his New York City employment and relocated to Connecticut in 1994. During this time Gregory lived in the primary care of his mother in Connecticut. Once back in Connecticut, Mr. Bauer continued to work for New York Life, primarily through telephone CT Page 6275 communications, until his retirement on his sixty-fifth birthday, July 16, 1997.
From the time Mrs. Bauer first moved to Connecticut in 1980 until late 1996, she was employed by CIGNA in Hartford. By 1996, Mrs. Bauer had become a Senior Vice President. In June of 1996, Mrs. Bauer lost her employment due to changes in the corporate structure and personality issues with a senior colleague. Toward the end of the year, she was offered employment as Vice President for Marketing at Reliastar Financial Corporation in Minneapolis, Minnesota. This is the only employment offer she received. After the family traveled to Minnesota in early January 1997, Mrs. Bauer accepted the company's employment offer, and shortly thereafter she relocated to Minneapolis. At the time Mrs. Bauer decided to join Reliastar, it was her understanding, based on conversations with Mr. Bauer and their mutual satisfaction with the Minneapolis area, that Mr. Bauer and Gregory would be joining her in Minnesota once suitable housing could be located. Indeed, the parties placed their Simsbury home on the market in January, 1997. While the parties were in Minnesota in early January, they looked for housing, and they agreed that the family would move to the Minneapolis area. Subsequently, while Mrs. Bauer was in Minnesota alone in the early months of 1997 in conjunction with the start of her new job, she continued to look for housing, and she periodically sent information to Mr. Bauer about housing prospects. In April, Mrs. Bauer found a suitable home and signed a purchase agreement contingent on her husband's approval. At this point, with Mrs. Bauer approximately three months into her new employment, Mr. Bauer informed her that he did not intend to move to Minnesota and that he wanted a divorce. Shortly thereafter, this action was filed by the plaintiff.
During the pendency of the action, Mrs. Bauer has remained in Minneapolis. Mr. Bauer and Gregory live on Holcolm Street in Simsbury, Connecticut in a home purchased by Mr. Bauer after the family residence was sold in June, 1997.
With respect to the cause of the marital dissolution, Mr. Bauer testified that his wife had increasing expressions of anger on her part without reason and that she had asked for a divorce on several occasions in late 1996 and early 1997. He claimed that once the plaintiff insisted that any home purchased in Minnesota be in her name alone, and that she should receive all the proceeds from the prospective sale of the Simsbury home, he decided not to go Minnesota and to seek a divorce. His claim CT Page 6276 rings hollow. As to the Minnesota home, the better evidence is that Mrs. Bauer intended to take ownership of the property in joint names. On the residential loan application, Mrs. Bauer listed herself and Mr. Bauer as prospective co-owners, intending to take title in joint tenancy. Defendant's Exhibit G, Residential Loan Application.
Mr. Bauer's refusal to move to Minnesota was not the beginning of the parties' marital difficulties. Their relationship had been problematic since its inception. The parties met and began dating while Mr. Bauer was still married to his second wife. Early in their relationship, the parties' career paths were the cause of disharmony and a factor in their periodic separations. So, too, was Mr. Bauer's excessive consumption of alcohol. Mrs. Bauer testified credibly that Mr. Bauer periodically drank to excess and that she frequently argued with him about his abuse of alcohol. Additionally, for several years of the marriage, while Mr. Bauer was employed in New York City, the parties saw each other only on weekends and shared little of their lives together. It is evident to the court that by the time Mrs. Bauer lost her employment in Connecticut, the marital bond was insufficient for Mr. Bauer to make the necessary accommodation to keep the family together while permitting Mrs. Bauer the opportunity to continue her career. Thus, while the marriage may not have been well founded, and suffered erosion during its course, the court finds that it's ultimate demise was occasioned by Mr. Bauer's refusal to move to Minnesota and his announcement to Mrs. Bauer that he intended to seek a divorce. Thus began the competition.
THE PARTIES
 MR. BAUER
Charles Bauer is sixty-four years old and a member of MENSA. This is his third marriage. He has two sons and a daughter from his first marriage which ended upon his wife's death from cancer. While he and Gregory have periodically visited his son John and his family in Vermont, he has no ongoing relationship with his other son and daughter. As noted, Mr. Bauer's second marriage ended in divorce.
Although he is not a four-year college graduate, Mr. Bauer has held a series of responsible employment positions in the insurance field. He was last employed by New York Life Insurance CT Page 6277 Company, Inc., as a sales person earning an annual gross of approximately seventy-five thousand ($75,000) dollars. He has been retired since 1994 and presently receives yearly pension income of approximately twenty-three thousand, seven hundred ($23,700) dollars and social security for himself and Gregory of approximately twenty-three ($23,000) thousand dollars. In addition, he reports annual passive income from investments of approximately thirty-nine thousand, six hundred ($39,600) dollars.
Mr. Bauer leads a sedentary life in his retirement. He has no apparent involvement in the community life of Simsbury. Though highly intelligent, he did not indicate interest in any particular intellectual, creative, or physical pursuits other than gardening, reading, and the occasional foray to the movies with Gregory. He does not drive in the evening.
Though he denies it. Mr. Bauer abuses alcohol. Until his use of alcohol became an issue in this dispute, he was a daily drinker, consuming beer occasionally at lunch, martinis in the evening, and wine periodically with dinner. While for some people, this history of consumption might not be problematic, Mr. Bauer has been advised medically that he should abstain from all drinking because he has a history of seizures. Though the number of seizures is disputed by the parties, it appears to the court that Mr. Bauer has had at least three convulsive episodes in his life time, each one associated with alcoholic intake. As early as 1970, Mr. Bauer was advised to discontinue any consumption of alcohol because of his past history of convulsions associated with alcoholic intake. Additionally, he is aware that Gregory does not like him to drink and that Gregory avoids him when he is drinking. In his custody evaluation report, Dr. Black noted that Mr. Bauer's drinking bothers Gregory, and that Gregory avoids his father when he's drinking because it makes him more irritable, difficult to talk to, and forgetful. Plaintiff's Exhibit 7, Custody Evaluation Report of James C. Black, M.D. Thus, in spite of medical advice to abstain from alcohol, and aware that his drinking is problematic for Gregory, Mr. Bauer continues to drink. From this behavior, the court concludes that Mr. Bauer is either alcohol-dependent, and thus unable to control his drinking, or he is not alcohol dependent, and he drinks in defiance of medical advice and his son's wishes. Mr. Bauer was evaluated for substance abuse in conjunction with this action by Allan M. Jacobs, M.D., a psychiatrist with the Institute of Living in Hartford. While concluding that Mr. Bauer does not fit CT Page 6278 the criteria for a diagnosis of Alcohol Dependence, Dr. Jacobs found that he does fulfill the criteria for alcohol abuse. This conclusion is not inconsistent with the observation by clinical psychologist Frank Stoll that, "In light of Mr. Bauer's three seizure episodes brought on by alcohol and his continued heavy drinking at least until the early 1980's resulting in a seizure in 1985, it seems that Mr. Bauer at least had a significant alcohol dependency history until 1985, when he may have moderated his drinking." Defendant's Exhibit AA, Psychological Report of Frank J. Stoll, Ph.D., of significance to the court was the conclusion by Dr. Jacobs that Mr. Bauer has not established any periods of abstinence despite being aware of alcohol's potential harm to him. Plaintiff's Exhibit 39, Report of Allan M. Jacobs, M.D. Given his medical history of seizures, Mr. Bauer's continuing consumption of alcohol is self destructive behavior.
Mr. Bauer also smokes approximately a pack of cigarettes daily against medical advice, and contrary to Gregory's desires. In 1992 he reported to the Medical Department at New York Life that he had been smoking for forty years, up to two packs a day for the last five to ten years. In 1996, he was diagnosed as having early stages of emphysema. While Mr. Bauer testified that he smokes in the bathroom upstairs and the fumes don't leave the bathroom, the court takes this claim as no more than a school boy's fantasy that evidence of smoking can be kept from the unwary.
Mr. Bauer had a neurological evaluation with Edward Fredericks, M.D., in conjunction with this pending action. While concluding that Mr. Bauer's seizure history has no implications for his ability to care for his teenage son, Dr. Fredericks noted that each of Mr. Bauer's reported seizures had occurred after alcohol intake the night before. Seizure medication was prescribed for him which he discontinued against medical advice.[3] Notwithstanding medical advice, Mr. Bauer continues to smoke daily and to consume alcohol. These behaviors have implications for his suitability as Gregory's primary custodial parent.
A psychological evaluation of Mr. Bauer conducted by Frank Stoll, Ph.D., reveals that Mr. Bauer has a Full-Scale IQ of 135, placing him in the 99th percentile in terms of mental ability. Relevant to the court's custody determination is the following finding of one of the tests undertaken by Mr. Bauer: CT Page 6279
"It is probable that this man lacks much insight into himself and others. Unless he receives clear guidance as to what is correct or proper, he may be quite indecisive and easily upset. Deviations from his routine may produce anxiety. However, this report may fail to disclose such difficulties because of his tendency to deny discordant emotions. He strongly desires to appear in a good light, and toward this end, he not only adheres to social conventions but is disinclined to admit any social shortcomings. Furthermore, he dreads making mistakes or taking risks, lest they provoke disapproval and punishment. Contributing to these fears is a conscience that serves to counter his self-important urges and self-aggrandizing thoughts. As a consequence of constraining his feelings and rigidly denying emotional conflicts, he may have a history of psychosomatic complaints and functional symptoms." Defendant's AA, Report of Frank Stoll, Ph.D. Mr. Bauer was also found by Dr. Stoll to have a strong narcissistic component to his personality structure. Dr. Stoll reported, "His narcissism involves a marked tendency to need frequent reaffirmation of an exaggerated or over-valued sense of personal worth. Repeated frustrations that Mr. Bauer has experienced in his attempt to seek affirmation of his elevated self-esteem may have contributed to his negativism as well as to the development of characteristic narcissistic-level defenses, such as rationalization, denial and externalization." Id. Dr. Stoll observed that Mr. Bauer's personal relationships appear to be somewhat problematic. "He seems to be a rather emotionally constricted person who rarely allows himself to show strong emotions. While he needs a fair amount of superficial social contact, he appears to be quite distant and guarded interpersonally, never allowing others to get close to him. Mr. Bauer's characteristic defensiveness about allowing interpersonal closeness appears to have contributed to the failure to develop true intimacy in his current marriage." Id. Dr. Stoll concluded, "This examiner's impression is that Mr. Bauer has clearly had a problem with alcohol dependence in the past. It is not clear whether he continues to have these problems at the present time. He does appear to display signs of a mixed DSM-IV Axis II character disorder, namely Personality Disorder, Not Otherwise Specified with Obsessive-Compulsive and Narcissistic Features. Mr. Bauer's defensive responses to the personality tests make it somewhat difficult to determine whether these are just prominent and maladaptive personality traits or whether they have reached the threshold for a full mixed personality disorder." Id.
During the first eleven years of Gregory's life, from 1983 to CT Page 6280 1994, while Mr. Bauer lived in New Jersey, he had a weekend and telephone relationship with Gregory. When he was home on weekends, he took part in activities with Gregory, he cooked, and he participated in yard work. He had no direct involvement with Gregory's various schools, attending no parent-teacher conferences. Though he left Gregory's primary care to Mrs. Bauer, they frequently discussed issues relating to Gregory during their near-daily phone conversations. Once he relocated to Connecticut, Mr. Bauer became more directly involved with Gregory. He assisted in transporting Gregory to school, and he participated in some outdoor activities with Gregory. He also helped Gregory with his homework and with special projects for school.
Following Mrs. Bauer's relocation to Minnesota Mr. Bauer has assumed the primary responsibility for Gregory's care. It has not gone well. Until recently, Gregory was failing two subjects at Simsbury High School. He has few, if any, friends. On weekends he neither goes to the homes of other youngsters nor invites them to his home. For most of the first term, Mr. Bauer was unaware that Gregory was not completing his homework and that he was doing poorly in school. Once the school brought Gregory's precarious academic situation to Mr. Bauer's attention, he responded appropriately. For the past few months he has been regularly assisting Gregory with his homework, ensuring that it is done completely, and he has been cooperating with Gregory's tutor and school counselor.
MRS. BAUER
Mrs. Bauer is fifty-two years old. She is a college and law school graduate. This is her second marriage. Her prior marriage lasted just three years, ending in divorce in 1975. Gregory is her only child.
Since April, 1997, she has resided on Boulder Point Road, in Eden Prairie, Minnesota, in conjunction with her employment at Reliastar. She presently earns a base salary of one hundred sixty thousand ($160,000) dollars. In addition, she has received various incentive awards bringing her total compensation to approximately two hundred and twenty-six thousand ($226,000) dollars for the first year of her employment.[4]
Until the parties' separation in January, 1997, Mrs. Bauer was Gregory's primary caretaker. When Gregory was born in 1983, Mrs. Bauer took approximately six weeks off from work and then CT Page 6281 returned to work, leaving Gregory in the care of a nanny during the day. While there was credible trial evidence that Mrs. Bauer's employment necessitated periodic overnight travel and occasional evening meetings, and that she regularly arrived home from work after dinner, there was also anecdotal evidence from former co-workers that Mrs. Bauer often arranged her work schedule to accommodate Gregory's particular needs.[5]
Tracey Rohan, who came to work for Mrs. Bauer in 1989, was the family's first live-in nanny, remaining with the family until late 1994. During the early years of Gregory's life, Mrs. Bauer was intimately involved in Gregory's care, dressing him in the morning, caring for him upon her return from work, and arranging for his medical appointments. As Gregory became older, she engaged him in activities. She introduced him to the computer and arranged piano lessons for him. She took him to soccer, swimming, and tennis lessons, all of which he enjoyed. When Mr. Bauer was home on weekends, it was Mrs. Bauer who arranged family activities. Though Mr. Bauer was attentive and playful with Gregory on weekends, his role in Gregory's life was secondary to Mrs. Bauer's caretaker functions until January, 1997.
Mrs. Bauer also took the lead in making decisions regarding Gregory's education. Gregory has attended seven schools in nine years. From kindergarten through the second grade, Gregory attended the Roaring Brook Elementary School in Avon. He was transferred to a private school, the Renbrook School, for one half of third grade and then returned to Roaring Brook to finish the year. He was then enrolled at the Talcott Mountain Academy where he spent his fourth and fifth grades before being transferred to the Squadron Line School, a public school in Simsbury, for sixth grade. Next, he was enrolled at the Watkinson School where he remained for nearly two years until, March 1997, when he was sent to the Henry James Middle School in Simsbury. In September, 1997, Gregory enrolled at the Simsbury High School where he is presently in the ninth grade. While Mr. Bauer asserts that he participated vicariously in Gregory's life by consulting with Mrs. Bauer over the telephone daily, he disclaims any responsibility for Gregory's peripatetic educational path except for the transfer to Squadron Line, which he said occurred as a result of the family's move to Simsbury. While Mrs. Bauer claims that the school placement decisions were only made after consultation, she has acknowledged that some of the transfers may have been ill advised. CT Page 6282
Mr. Bauer also claims that the manner in which Mrs. Bauer handled Gregory's difficulties at the Watkinson School reflects poorly on her judgment. The court agrees in part. It appears that both parents mishandled the family's relationship with Watkinson. Emblematic of this problem is a letter dated January 13, 1997 from Mr. and Mrs. Bauer to the Watkinson School. This letter starts, "I want to take this opportunity to tell you how disappointed we are with Watkinson this year and the education that Gregory is getting there is 5th grade. I certainly have much higher expectations for him and unfortunately, it appears to me that he will not be ready for 9th grade next year in a very competitive school district in Minnesota where he will be attending school." Plaintiff's Exhibit 29, Letter from Charles and Patricia Bauer to Ms. Martha Bracken-Harris, Watkinson School. The tone of this letter is condescending and pugnacious. It concludes, "At this point, we are very sorry we enrolled Greg in Watkinson for the grade, particularly given the $16,000 we wasted. We need to make the change in math immediately, before Greg wastes any more time in his current class." Id. Nowhere in this letter did Gregory's parents reflect an understanding that Gregory should share some responsibility for the situation they describe. When Gregory subsequently got into a fight at Watkinson and the school insisted that he obtain counseling as a prerequisite to returning to school, Mrs. Bauer wrote, "Your attempt to hold my son in some way responsible is totally unacceptable. We are both extremely angry at the poor way in which you have handled this situation. If any action is taken against my son, in any way, or if any record is made of this incident in his school record, we will institute a lawsuit against the school and the Hear family immediately." Plaintiff's Exhibit 30, letter of Patricia Bauer to Mrs. Bracken-Harris, Watkinson School dated March 6, 1997. The letter continues, "You need to understand that Greg Bauer is not at fault in this incident and I will not permit him to be blamed. I was probably too lenient with you in prior incidents where you were too quick to blame Greg — I simply will not let that happen here!" Id. The letter closes, "Unfortunately, this is yet another example of the poor performance of Watkinson which makes it a totally unsuitable school for most of the children in Greg's class, who I understand will not be returning next year." Id. This was an overly protective and competitive response to a situation in which Gregory should have been encouraged to take some measure of responsibility.
Mrs. Bauer's disinclination to find fault with Gregory is CT Page 6283 not, however, unique. During this school year, while Gregory has been struggling in many of his classes, guidance and remedial teachers at Simsbury have intervened to provide an intense program of tutoring and direction for him. This assistance was not the result of any initiative on Mr. Bauer's part. Indeed, it is evident that Gregory was failing amidst Mr. Bauer's inattention and ignorance. In this context, Mr. Bauer wrote to the school on January 21, 1998, challenging and disputing a grade given to Gregory. This, too, was an inappropriate, overly competitive missive.
GREGORY
Gregory is presently living with his father in Simsbury and attending the Simsbury High School in the ninth grade. From his parents' accounts as well as the court's direct observations, it is evident that Gregory is a highly intelligent, personable, and sensitive youngster who is loved by both his parents. He is also at risk. Torn between his warring parents, Gregory is depressed and anxious. Caught in the turmoil of his parents' battle, he feels left-out, unattended to, and he is fearful that his own needs and desires may be overlooked. Ironically, the experience of his parents' competition for his custody has negatively impacted his self esteem, and his sense of well-being.
Gregory is a quiet, though witty youngster. He enjoys computer games, and has recently rekindled his interest in the piano. This is a wonderful creative outlet for him.
Gregory's school records demonstrate that he is a youngster of ability who needs ongoing supervision and direction to ensure that he does his work thoroughly and diligently. Though he was described at trial as a successful elementary and middle school pupil who has had difficulty in high school because his intuitive abilities are insufficient for the material he presently confronts, a review of his earlier school records reveals that some of Gregory's inadequate study habits and his episodic absence of attention are not newly developed. As early as 1990, his language arts teacher, though noting that Gregory was a good reader, commented that he needed "prodding to do more than average work". Defendant's Exhibit CC, School records. In 1991, a teacher noted that Gregory, ". . . Does not do more than what is expected." Id. In the same year, another teacher noted that Gregory is the ". . . first one done-rushed through-weakness incomprehension. Does not live up to ability." Id. In 1992, a CT Page 6284 teacher noted that Gregory's creative writing efforts were "weak", and he needed to ". . . watch paying attention." Id. In 1990 in mathematics, both his innate abilities and his difficulties in concentration were noted. On the same page are the notes, "Does well. Picks up concepts quickly. Moved to higher group for September", and "careless errors-watch subtraction", and "careless errors-doesn't concentrate." Id. At the Watkinson School, his Geography teacher made a prophetic observation: "As a student, Greg seems to be a living contradiction. He does very well when he wants to, as evidenced by his final exam grad. But he does the easier daily assignments quickly with little care and effort. I have made suggestions to him about how to do a better job on these assignments but have not seen improvements. As class projects get bigger and tests get harder, Greg will have to do a better job or his grades will fall." Id. A year later, this same mentor, now teaching English, commented, "Greg has superb skills but stills tends to work too quickly. At times, he reads so fast that he forgets important details and doesn't do as well on the quizzes as he should. Greg's writing is lively, perceptive, sophisticated, and often quite funny. His myth was very entertaining. His average, however, was hurt because he handed two papers in very late. Greg's grade would improve if he became a more serious and disciplined student." Id.
Gregory's work effort appeared to consistently improve up to his last term at Watkinson beginning in January, 1997. Comments from his teachers in February and March, 1997 suggest that he was not doing all his homework. One teacher noted, "Greg gave an accurate reflection in his own comment this trimester-he simply stopped doing the daily work and, even though he was prepared for traditional tests, he was unable to follow through with consistent effort in participation in discussion or group work."Id.
A review of these records, combined with evidence of his first year at Simsbury High School, suggests that Gregory is a youngster of high academic ability but inconsistent focus and effort. In his present school environment, school counselors have identified Gregory's organizational and attention-focus needs. To counselors have identified Gregory's organizational and attention-focus needs. To date, it appears that Gregory has responded well to-the challenge. More importantly, he appears motivated to continue to improve his academic performance to close the gap between his innate ability and his work product. The court commends Gregory for his energy, diligence and CT Page 6285 perseverance, particularly as he is trapped in the swirl of his parents acrimonious dispute. From his therapist, Dr. Goodman, and caring teachers at school, and from the resources of his own character, Gregory has established a foundation of stability and a motivation to succeed. He is entitled to see the fruits of his efforts.
Outside of school, Gregory's life is without sparkle. Since the parties' separation, Mr. Bauer made some efforts to get Gregory involved in outside activities such as golf and tennis, but these efforts were not sustained. Gregory's weekends at home consist of playing computer games, playing the piano, going to an occasional movie with his father, and watching videos on television. He does not visit other youngsters' homes; none are any invited to his. On some weekends, he and his dad have visited Mr. Bauer's son, John, who lives in Stowe, Vermont.
Gregory notices the absence of peer relationships and would like to be able to have friends. He believes that he is beginning to make friendships at school.
Until the parties' separation and the tensions which have ensued, Gregory and Mrs. Bauer had a close relationship reflective of her past primary care taking role. He shared his feelings and confided in her. There was trial evidence that Gregory presently feels alienated from his mother, due, in part, to the fact that she has made negative comments about Mr. Bauer and his other children to Gregory, and due, in part, to the fact that she has exerted pressure on Gregory. This alienation is an unfortunate byproduct of the Bauers' dispute. The court believes that once Gregory and Mrs. Bauer have the opportunity to interact with one another with the custody issue decided, the factors which caused the alienation should subside. The court was also impressed with Mrs. Bauer's credible acknowledgment at trial that some of comments to Gregory, in the heat of this dispute, were inappropriate.
Gregory has made it clear to his parents and to the court that he wishes to remain in Simsbury, and a student at Simsbury High School. His yearning for stability is a quest in his best interests. Wilbur Nelson, Ph.D., who conducted a psychological evaluation of Gregory, concluded that he has the requisite intelligence to have an informed preference concerning his living circumstances. The court agrees. Pursuant to the agreement of the parties, the court met with Gregory in chambers for approximately CT Page 6286 one hour.[6] This meeting was beneficial to the court.
While Gregory's academic performance at Simsbury is not up to his abilities, the court finds significance in the improvements Gregory has made since he has started to receive extra assistance. He has improved his grades significantly in the two courses he was previously failing. His class participation, though not outstanding, is improving. Comments from school personnel support the belief that he is becoming adjusted to the rigors of a high school curriculum and that he is motivated to succeed in his present environment. He should be given the chance. The court is impressed that Simsbury High School, though a large institution of approximately fifteen hundred (1500) students, has the insight, capacity, and interest to provide individualized assistance to Gregory.
During the course of the proceedings, the court ordered that Gregory be psychologically evaluated. Wilbur Nelson, Ph.D., who conducted the evaluation, described Gregory as functioning in the Superior range of intelligence, ". . . leaving no doubt that his cognitive abilities represent a strength." Child's Exhibit 2, Psychological Evaluation of Gregory Bauer. Significantly, Dr. Nelson also found Gregory to suffer from depression and affective disruption. He noted that Gregory's self-esteem and self-perception are quite negative, that he compares himself unfavorably with others, and that he may have fallen short of his parents' expectations. Dr. Nelson concluded, "Self-esteem is impaired, with Greg experiencing substantial self-blame, pessimism about the future, and an overall sense of helplessness and vulnerability . . . Greg does not expect adults to be supportive and genuinely caring instead perceiving them as self-absorbed and unavailable" Id.
Clearly this is a youngster under siege. While Gregory's parents wage war, they litter the battlefield with the fragments of his well-being. The court shares the view of nearly all the mental health professionals involved with the Bauer family that Gregory's foremost need is for his parents' warfare to stop, and for them to begin to work in unison for the restoration of Gregory's well-being.
Given his personality and history of uprootings, Gregory is entitled to stability and the opportunity to deepen his connection to Simsbury and to the school community at Simsbury High School. It is time to honor Gregory and to accord value to CT Page 6287 his wishes.
COURT-ORDERED CUSTODY EVALUATION
On July 2, 1997, the court appointed James C. Black, M.D. to conduct a custody evaluation. Dr. Black prepared a lengthy report, dated August 26, 1997, and also testified extensively during the trial. A substantial portion of Dr. Black's report is a recitation of the parties' respective allegations concerning their personal and marital histories, including varying versions of the extent to which each of them provided for Gregory's needs during the marriage. In his report, Dr. Black noted that, "Greg views himself as a mixture of each of his parents, and part of him is not like either one of them." Plaintiff's Exhibit 7, Custody Evaluation Report. The court also finds significance in Dr. Black's assessment that, "For students, and especially those like Greg, it is very important to handle and cope with problems as they arise in any one particular academic environment rather than switching environments as a means of solving the problem at hand." Id. Dr. Black concluded, ". . . Ms. Bauer has demonstrated that she has been a consistently loving parent, who clearly was his principal attachment figure and primary caretaker in Greg's earlier life, and who has shepherded him into adolescence by means of keeping a watchful and caring eye on his schoolwork, activities, social life and general well-being." Id.
In assessing the parties, Dr. Black appears to have the view that Mr. Bauer's self-destructive behaviors are of secondary importance, and he asserted that Mr. Bauer has been a positive role model for Gregory. The court disagrees. From all the evidence adduced at trial, the court does not dismiss Mr. Bauer's self destructive alcohol use and cigarette smoking, and his depressive life style, as of minimal relevance to Gregory's best interests. While the court does not criticize Mr. Bauer for the life style he chooses, since Gregory has been in his primary care he has made Gregory his best friend and sedentary partner. Gregory would like to have friends, and to be involved in peer-appropriate activities. The parent charged with his care must strive gently but unfailingly to expose Gregory to opportunities for social interaction with youngsters his own age in stimulating and challenging activities.
Nor does the court find, from the better evidence, that Mrs. Bauer has tended to place her career goals above the needs of Gregory. Mrs. Bauer's task, in this regard, is to translate the CT Page 6288 example of her commitment to success to Gregory in a manner which energizes but does not daunt or overwhelm him.
The court agrees with Dr. Black that the both Mr. and Mrs. Bauer, and particularly Mrs. Bauer, have tended to react to situations involving Gregory's behavior at school without regard to Gregory's responsibility for the situations and in response to their own ego needs to be the parents of a blameless child. To blame others for Gregory's shortcomings is to deny Gregory the opportunity for self-awareness and improvement.
In his August, 1997 report, Dr. Black recommended that the parties share joint custody with Greg to reside in Simsbury with his father. During his testimony, Dr. Black recommended that Gregory be permitted to continue this semester in Simsbury with a review this summer. Dr. Black further suggested that if Gregory has managed to improve his work at Simsbury, consideration should be given to his remaining in Simsbury, but if he was failing at Simsbury, then consideration should be given to a move to Minnesota. At trial, after Dr. Black had the opportunity to review the psychological evaluations of the parties and Gregory, he testified, in essence, that Gregory should reside with the parent more able and willing to respond to Gregory's psychological, emotional, and developmental needs. With this last assessment, the court agrees.
ALLOCATION OF ASSETS AND DEBTS
When the parties married, their assets were minimal. When they sold their home in Levonia, Michigan in conjunction with Mrs. Bauer's move to Washington, D.C., they split the net proceeds. Mrs. Bauer relocated to Connecticut in January, 1980 to begin employment with CIGNA and Mr. Bauer joined her in June, 1980. Shortly thereafter, the parties purchased a home on High Ridge Road in Avon for the sum of one hundred and forty thousand ($140,000) dollars. The house was financed with a mortgage of one hundred and ten thousand ($110,000) dollars and a down payment of thirty thousand ($30,000) dollars realized from the sale of the plaintiff's home in Washington, D.C. Mr. Bauer made no contribution toward the purchase of this home. Though initially taken in joint names, this property was transferred to Mrs. Bauer's name alone in 1981 because of factors in their then ailing premarital relationship. Subsequently, in 1983, Mrs. Bauer transferred a one half interest in the property to Mr. Bauer. This property was sold in 1994 for approximately two hundred CT Page 6289 thousand ($200,000) dollars, from which the parties netted approximately one hundred thousand ($100,000) dollars.
The parties purchased their home on Great Pond Road, Avon for three hundred and seventy-five thousand ($375,000) dollars with a mortgage of one hundred and seventy-five thousand ($175,000) dollars. The down payment of two hundred thousand ($200,000) dollars came from four sources: one hundred thousand ($100,000) dollars from the sale of the High Ridge property; thirty thousand ($30,000) dollars from the plaintiff's 401k plan; fifty thousand ($50,000) dollars from Mrs. Bauer's 401k plan; and, twenty thousand ($20,000) dollars from a mutual fund in Mrs. Bauer's name. From the sale of the home, the parties currently hold the net proceeds of two hundred and fifteen thousand ($215,000) dollars in escrow.
When Mr. Bauer obtained employment in New York City with New York Life, he purchased a condominium in New Jersey for ninety-five thousand ($95,000) dollars, obtaining ten thousand ($10,000) dollars from the defendant for a down payment and financing the balance. During the years Mr. Bauer lived in New Jersey, the parties kept their finances entirely separate. Mr. Bauer made no contribution toward Gregory's care or schooling. Mrs. Bauer paid all the household expenses for the Connecticut property while Mr. Bauer paid all the expenses for his condominium in New Jersey.
Once Mr. Bauer relocated to Connecticut in 1994, he contributed five hundred ($500) dollars a month toward the household expenses, and a lesser amount for cleaning services. He also testified that he expended nine to ten thousand ($9,000-$10,000) dollars toward household repairs and maintenance. For these payments, Mr. Bauer had the use and occupancy of the home. Payment of these amounts did not contribute to the appreciation in value of the home. In total, they are no more than reasonable room and board.
Other than this escrow account, the parties have no assets in common. On his financial affidavit filed in conjunction with this hearing, Mr. Bauer indicates that he has Fidelity investments valued at approximately six thousand, six hundred ($6,600) dollars and retirement assets totaling approximately two hundred, thirty-two thousand ($232,000) dollars. He also shows ownership of a home located on Holcolm Road in Simsbury with approximately seventy-three thousand ($73,000) dollars in equity. His liabilities approximate eighteen thousand ($18,000) dollars. Mrs. CT Page 6290 Bauer's affidavit reflects ownership of a home in Eden Prairie with approximately two hundred and seventy-seven thousand ($277,000) dollars in equity, a fidelity money market account valued at eleven thousand, two hundred ($11,200) dollars, and deferred compensation worth one million, one hundred and nine thousand ($1,109,000) thousand dollars. Her liabilities, including costs of this litigation, are approximately eighty-seven thousand ($87,000) dollars.
During the course of the marriage, each of the parties invested his and her earnings without regard to the other. Neither contributed either directly or indirectly to the acquisition, maintenance, or appreciation in value of any of the assets in the other's name. During the course of the trial, the court heard evidence concerning movements of substantial funds by the defendant from one investment form to another, and even from a depository to her home during the early stages of this litigation. While these furtive transactions reflect poorly on Mrs. Bauer's motive and intent at the time, she took nothing from the plaintiff to which he had any entitlement in this action.
At the time the plaintiff retired, the defendant refused to waive her survivorship benefits in his pension plan. As a consequence, the amount of Mr. Bauer's monthly pension benefit has been diminished by two hundred ($200) dollars. Given the significant age discrepancy, earning capacity, and ownership of assets between the parties, the defendant's refusal unnecessarily diminished the plaintiff's monthly earnings. The court has taken this factor into consideration in its orders concerning the allocation of assets.
ALIMONY
While the plaintiff has presented a claim for alimony, his quest is not bolstered by the evidence. The fact that there are differences in earnings and estates between the parties does not alone create an alimony obligation or entitlement. During the course of their marriage, the parties essentially led separate professional and economic lives. Until the plaintiff's refusal to relocate to Minnesota, neither contributed to or hindered the professional advancement or asset accumulation of the other. The plaintiff's earnings from his pension, social security, and passive income from investments approximates a weekly gross of one thousand ($1,000) dollars. It is adequate to meet his reasonable needs and to maintain his life style. The court has CT Page 6291 considered the unwarranted diminution in his monthly income as a result of the defendant's refusal to waive her survivorship interest in his pension in its order for the allocation of assets.
ORDERS
THE MARRIAGE
The court finds the marriage has broken down irretrievably without hope of reconciliation. Accordingly, a decree may enter dissolving it on that basis.
CUSTODY
In this matter, both parties seek an order of joint custody. Where the parents have agreed to an award of joint custody, there is a presumption that joint custody is in the child's best interest. Cf. C.G.S. 46b-56a. From the facts adduced at trial, the court finds that it is in Gregory's best interests for his parents to share his joint legal custody. Accordingly, custody of Gregory is awarded jointly to both parties. The parties are ordered to consult with one another concerning Gregory's educational, health, religious, and general developmental needs. In order to effectuate this order, and as a condition of it, the parties shall engage in joint counseling for the purpose of assisting them to perform their function as joint custodial parents. This counseling shall take place in Connecticut and shall be with a counselor chosen by the parties. In the event the parties are not able to mutually select a counselor, counsel for the minor child shall file a motion for the court to select a counselor, and the parties shall meet with the counselor chosen by the court. In the event the defendant relocates to Connecticut, the counseling shall consist of semi-monthly meetings commencing in the month following the defendant's relocation and it shall continue for a period of six months or until the parties are earlier discharged by the counselor. In the event the defendant does not relocate to Connecticut, the counseling shall take place on a monthly basis, beginning in July and shall continue for a period of six months or until the parties are earlier discharged by the counselor. The parties shall cooperate fully with the counselor and with each other in order to maximize the effectiveness of this counseling. The cost of the counseling shall be borne equally by the parties. In the event either party fails to comply with this order concerning CT Page 6292 counseling, such failure may become a basis for a motion to modify the order of joint legal custody.
Gregory shall reside in Simsbury and shall attend Simsbury High School until graduation, contrary decision by the Simsbury Board of Education, or order of this court based on a properly filed motion to modify.
The court is authorized to make this educational decision by the language of 46b-56 which states, in part, "(a) In any controversy before the superior court as to the custody or care of minor children, and at any time after the return day of any complaint under section 46b-45, the court may at any time make or modify any proper order regarding the education and support of the children and of care, custody, and visitation if it has jurisdiction under the provisions of chapter 815o."
Both parents offer positive and negative qualities as prospective primary caretakers for Gregory. In balance, the court finds that Gregory's best interests would be served by being in his mother's primary care on condition that Mrs. Bauer reside with Gregory in Simsbury. In this regard, the court is mindful that Mrs. Bauer testified that she would relocate to Connecticut if that was made a necessary condition of obtaining primary care responsibility for Gregory. While the court is mindful of the negative economic and professional consequences likely to befall Mrs. Bauer should she decide to move back to Connecticut, the court's paramount concern is Gregory's well-being. While it is in his best interest to reside with Mrs. Bauer in Simsbury so that he can remain in the Town and school community, the court finds that among lesser alternatives, it would be preferable for Gregory to live with his father in Simsbury than to be relocated against his will to yet another school in a new community.
Mrs. Bauer is Gregory's primary attachment figure. She is most tuned to his needs for academic achievement, creative expression, and socialization. As an active woman, she presents a positive role model for Gregory. She must be sensitive, however, to Gregory's inner fears and doubts, and to his need to feel loved for who he is and not for what he should be. He should not be driven to success to meet her needs for him to achieve Gregory also finds comfort with his father. While the court has significant concerns that Mr. Bauer's self destructive abuse of alcohol and cigarettes amidst Gregory's evident discomfort increases Gregory's sense of insecurity and valuelessness, and CT Page 6293 his reclusive and sedentary lifestyle provides a negative role model for Gregory, his quiet and friendly demeanor and his evident love of Gregory are a safe harbor for him. Gregory's observation that he is a part of two very different people is insightful. Each provides a portion of Gregory's needs. Without both parents, Gregory is fragmented. For all the money they have spent on this competition, the parents can win their child's success by listening to the wisdom and the pain in his voice. He expresses no preference for either parent because he senses his need for both.
Because of the present geographical location of the parents, the court enters conditional orders concerning custody.
Primary physical custody of Gregory is awarded to the defendant once she becomes a resident of Simsbury and so long as she moves to Simsbury by the end of summer, in time for Gregory to resume school in the fall. In no event should Gregory's custody be changed from his father to his mother until the present school year is completed in June.
In the event the defendant chooses not to relocate to Simsbury, primary residence of Gregory is awarded to the plaintiff. In either case, Gregory's primary residence shall not be removed from Simsbury until further order of this court, Mrs. Bauer is directed to inform Gregory and Mr. Bauer by June 15, 1998 of her decision whether she intends to relocate to Connecticut to assume primary responsibility for Gregory's care.
In the event the defendant relocates to Connecticut, the plaintiff shall have physical care of Gregory on alternate weekends commencing on Friday evening and ending on Monday morning, when Gregory will be taken to school by the plaintiff. In addition, the plaintiff and Gregory shall have time together for one afternoon a week, on Wednesdays, following school until 8 p. m. when the defendant shall pick up Gregory from his father's home. The plaintiff is ordered not to consume any alcoholic beverages at any time that Gregory is in his care.
In addition, in the event the defendant relocates to Connecticut, the parties shall alternate Thanksgiving with the plaintiff to have Gregory with him this Thanksgiving. As to Christmas, the parties shall alternate Christmas and Christmas Eve day with the plaintiff to have Gregory with him on Christmas Eve day this year from midday until 9 p. m. when the defendant CT Page 6294 shall pick up Gregory from his father's home. Gregory shall be with his mother this coming Christmas day. As to the Christmas school break, the plaintiff shall be entitled to Gregory's custody for a period of three days during the holidays in addition to his normal access schedule. The schedule for these days shall be worked out by the parties and Gregory by the first week of December. During Gregory's winter school break, the plaintiff shall have an extended weekend with Gregory either at the beginning or end of the break, depending on the calendar so that his access shall either commence on Wednesday evening and end Monday morning, or begin on Friday evening and end of Wednesday evening. It is the court's intention that the extra days shall overlap with Gregory's winter vacation and be an extension of the plaintiff's regularly scheduled weekend access. Finally, as to summertime, Gregory shall spend the month of July residing with his father and the month of August with his mother. With the exception of any vacations planned by either or both parents, the parent with whom Gregory is not residing during the summer time shall have access on alternate weekends and Wednesday evenings as previously stated for Mr. Bauer during the school year.
In the event the defendant does not relocate to Connecticut, she shall have the right to physical custody of Gregory for one weekend a month commencing on Friday evening and ending on Monday morning when Gregory shall be returned to school. In addition, she shall be entitled to Gregory's physical custody on alternating Thanksgiving weekends from Wednesday evening until Sunday evening, commencing in 1999, for one half the Christmas school holiday, including Christmas day on alternate years beginning this year, and for the entire winter holiday. Finally, under these circumstances, she shall be entitled to Gregory's custody for a period of seven weeks during the summer time. She shall notify Gregory and the plaintiff by April 1st of each year of the precise dates of Gregory's summer schedule with her.
The court reserves decision on the issues of child support, health insurance and health care payments, since the amount of support, the identity of the support payer, and health care coverage may be determined by the defendant's decision whether to relocate to Connecticut and the economic consequences of that decision. The issues of support and health care for Gregory are continued for a hearing to be held on August 5, 1998, at which time the parties shall provide current financial affidavits. Nothing in this order shall prevent either party from filing a CT Page 6295 motion for a determination of child support and health care in the event that Mrs. Bauer relocates to Connecticut prior to August or in the event that Mrs. Bauer makes a determination, prior to August, not to relocate to Connecticut to assume primary care responsibility for Gregory. In the interim, the pendente lite orders regarding support and health care for Gregory are shall continue in full force and effect.
No award of alimony is made to either party. In making this determination the court has considered all the statutory criteria set forth in C.G.S. 46b-82, and also the possibility that should Mrs. Bauer elect to return to Connecticut her earnings may be eliminated or substantially diminished.
From the escrow account, the plaintiff shall receive 55% of the balance and the defendant shall receive the remaining 45%. While the defendant's greater contribution to the acquisition, maintenance, and appreciation in value of this asset might suggest that she should receive a greater portion of this asset, the court has considered all the statutory factors enumerated in C.G.S. 46b-81 in making this determination, and the fact that the plaintiff's estate was unnecessarily diminished by the sum of two hundred ($200) dollars a month as a consequence of the defendant's refusal to waive her spousal entitlement to a survivor's share of his pension.
Apart from the escrow account, each party shall be entitled to the separate ownership of the assets each presently possesses as shown on the financial affidavits filed with the court
Both parties shall designate and maintain Gregory as the beneficiary of their existing life insurance policies and shall continue such designation until Gregory's eighteenth birthday to the extent the policy or policies remain available to them.
At the conclusion of the hearing, the defendant submitted amended claims for relief, including a request for certain personal property. In the event the defendant relocates to Connecticut to assume primary care of Gregory, the piano, golf clubs, cats, cat-related equipment, and gateway computer shall be transferred to the defendant for Gregory's use and enjoyment. In the event the defendant does not relocate to Connecticut as aforesaid, they shall remain the property of the plaintiff. The court has explicitly omitted Gregory's bedroom furniture from this order, as the court sees no reason to disturb Gregory's room CT Page 6296 at his father's home. If the defendant determines to relocate to Connecticut, that situation will present an opportunity for Gregory and his mother to select new furniture appropriate for his new household surroundings. All other personal property shall be owned by the person in possession.
Any remaining fees and costs due to any of the mental health professionals appointed by the court, the fee charged by Dr. Goodman in conjunction with his presence in court for Gregory's interview, and Attorney Santy's fees shall be responsible for his and her own fees and costs attendant to this litigation.
Each party shall be responsible for the liabilities each has separately incurred and shall hold the other harmless therefrom. In addition, the plaintiff shall be solely liable for payment of any taxes, interest, or penalties due to the State of New York on account of his earnings in that State during the marriage.
Pursuant to the policy enunciated in Yontef v. Yontef,185 Conn. 275 (1981), the custody orders entered in this matter shall not be stayed upon the filing of an appeal by either party. Judgement may enter accordingly.
Bishop, J.